UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CINDY JETTE                             :
                                        :
        v.                              :        C.A. No. 07-437A
                                        :
MICHAEL J. ASTRUE,                      :
Commissioner of the Social Security     :
Administration                          :

**MEMORANDUM AND ORDER**

This matter is before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Social Security Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"), 42 U.S.C. § 405(g). Plaintiff filed her Complaint on November 30, 2007 seeking to reverse the decision of the Commissioner. On May 30, 2008, Plaintiff filed a Motion to Reverse the Decision of the Commissioner. (Document No. 6). On July 15, 2008, the Commissioner filed a Motion for Order Affirming the Decision of the Commissioner. (Document No. 8). Plaintiff replied on August 1, 2008. (Document No. 9).

With the consent of the parties, this case has been referred to me for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Based upon my review of the record and the legal memoranda filed by the parties, I find that there is substantial evidence in the record to support the Commissioner's decision and findings that Plaintiff is not disabled within the meaning of the Act. Consequently, I order that the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Document No. 8) be GRANTED and that Plaintiff's Motion to Reverse the Decision of the Commissioner (Document No. 6) be DENIED.

**I.      PROCEDURAL HISTORY**

Plaintiff filed an application for DIB on January 15, 2002, alleging disability as of July 27, 2001. (Tr. 102-104). She later amended her onset date to September 1, 2001. (Tr. 171). Plaintiff's date last insured ("DLI") for DIB was September 30, 2002. (Tr. 19). The application was denied initially (Tr. 43-46) and on reconsideration. (Tr. 48-51). On January 9, 2004, a hearing was held before Administrative Law Judge Barry H. Best (the "ALJ") at which Plaintiff, represented by counsel, and a vocational expert ("VE") appeared and testified. (Tr. 642-672).

On April 28, 2004, the ALJ issued an unfavorable decision. (Tr. 32-42). The Appeals Council remanded the case to the ALJ for another hearing which was held on May 5, 2005. (Tr. 609-641). The ALJ issued a decision on September 1, 2005 again finding that Plaintiff was not disabled. (Tr. 15-29). The Appeals Council denied Plaintiff's request for review on October 12, 2007, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 10-13). A timely appeal was then filed with this Court.

## II.   THE PARTIES' POSITIONS

Plaintiff argues that the Appeals Council was egregiously mistaken in failing to remand due to additional opinion evidence submitted post-hearing. Plaintiff also argues that the ALJ failed to properly evaluate Plaintiff's chronic fatigue syndrome and fibromyalgia. Plaintiff further argues that the ALJ erroneously accorded the treating source opinions reduced weight and that he failed to properly evaluate Plaintiff's subjective complaints.

The Commissioner disputes Plaintiff's claims and asserts that the ALJ properly evaluated Plaintiff's physical impairments and that his RFC finding is supported by substantial evidence. The Commissioner also contends that the Appeals Council acted properly in refusing a second remand.

## III.   THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Where the Commissioner's decision is supported by substantial evidence, the court must affirm, even if the court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

The court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law. Nguyen v. Chater, 172 F.3d  31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) citing, Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985).

The court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. Seavey, 276

F.3d at 8. To remand under sentence four, the court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Id.; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the court cannot discern the basis for the Commissioner's decision, a sentence four remand may be appropriate to allow her to explain the basis for her decision. Freeman v. Barnhart, 274 F.3d 606, 609-610 (1st Cir. 2001). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a sentence four remand, the court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court...may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level. See Jackson v. Chater, 99 F.3d 1086, 1090-1092 (11th Cir. 1996).

A sentence six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095. With a sentence six remand, the parties must return to the court after remand to file modified findings of fact. Id. The court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. Id.

### IV.   DISABILITY DETERMINATION

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

### A.   Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275-276 (1st Cir. 1988).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(e). See also Dudley v. Sec'y of Health and Human Servs., 816 F.2d 792, 794 (1st Cir. 1987).

**B.      Developing the Record**

The ALJ has a duty to fully and fairly develop the record.   Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right if counsel is not retained.  See 42 U.S.C. § 406; Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987).  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  Id.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  See Heggarty, 947 F.2d at 997, citing Currier v. Sec'y of Health Educ. and Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

### C.      Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986).   In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  Carrillo Marin v. Sec'y of Health and Human Servs., 758 F.2d 14, 17 (1st Cir. 1985).

### D.      The Five-step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or

combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her RFC, age, education and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f). Significantly, the claimant bears the burden of proof at steps one through four, but the Commissioner bears the burden at step five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five-step process applies to both SSDI and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant bears the ultimate burden of proving the existence of a disability as defined by the Social Security Act. Seavey, 276 F.3d at 5. The claimant must prove disability on or before the last day of her insured status for the purposes of disability benefits. Deblois v. Sec'y of Health and Human Servs., 686 F.2d 76 (1st Cir. 1982), 42 U.S.C. §§ 416(I)(3), 423(a), (c). If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability. Id.

### E.     Other Work

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  Seavey, 276 F.3d at 5.  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids").  Seavey, 276 F.3d at 5.  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  Id.; see also Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills.  Nguyen, 172 F.3d at 36.  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  Heggarty, 947 F.2d at 996.  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

### 1.      Pain

"Pain can constitute a significant non-exertional impairment."  Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

> (1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
>
> (3) Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> (4) Treatment, other than medication, for relief of pain;
>
> (5) Functional restrictions; and
>
> (6) The claimant's daily activities.

Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986).  An individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### 2.      Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  Rohrberg, 26 F. Supp. 2d at 309.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.  The failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  See DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24 (1st Cir. 1986).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

## V.    APPLICATION AND ANALYSIS

Plaintiff was forty-seven years old at the time of the ALJ's second decision (Tr. 102), is a high school graduate (Tr. 120) with past relevant work experience as an office manager and a massage therapist.  (Tr. 115).  Plaintiff alleged disability due to toxic poisoning, chronic fatigue syndrome, strained muscles of the right wrist, right shoulder, back, right hip and knee.  (Tr. 114).  She asserted fatigue, pain and less stamina.  Id.

Plaintiff presented for mental health treatment with therapist Elizabeth Coderre, LMHC, on April 9, 2001 and began weekly therapy due to secondary trauma related to an incident that happened to her daughter.  (Tr. 186).  Plaintiff continued with therapy through 2001 (Tr. 188-209),

and her visits often revolved around issues related to her daughter.  (Tr. 189-192).  Plaintiff participated in "consuming activities" and could not commit to focusing on herself due to shortage of time.  (Tr. 192).  She was often unable or unwilling to make necessary changes in self-care.  (Tr. 196, 199).

Plaintiff initially alleged that her disability began on July 27, 2001.  (Tr. 102).  On July 21, 2001, Plaintiff presented to the Northwest Health Center complaining of a sore throat, fatigue and neck, back and ear pain.  (Tr. 230).  Plaintiff was started on Ultram for her myalgias and pain.  (Tr. 234).  In October 2001, Plaintiff's primary care physician, Dr. Mary Giovetti, referred her to an ear, nose and throat physician due to a lump in her throat and ear pain.  (Tr. 284).  Plaintiff was diagnosed with a benign lesion of her pharynx.  Id.  The next month, Plaintiff visited Dr. Wendy Clough for an evaluation of her pain and fatigue and a question of Epstein-Barr virus ("EBV").  (Tr. 316-318).  Dr. Clough documented that Plaintiff was working several hours per week as a massage therapist but had reduced her hours.  (Tr. 316).  She assessed that Plaintiff's EBV results were consistent with an old infection that had reactivated and was not related to Plaintiff's current symptoms.  (Tr. 318).  Dr. Clough noted that all the work up was negative and recommended that a toxicologist review the case due to Plaintiff's exposure to gasoline in her drinking water.  (Tr. 318, 324-325).  Dr. Clough ultimately diagnosed chronic fatigue syndrome.  (Tr. 326).  Plaintiff also complained of hand pain, but an x-ray taken on January 4, 2002 revealed a normal picture of the left and right hands.  (Tr. 243).

During this time, Plaintiff continued to visit her mental health therapist and exhibited a much improved mood and affect in January 2002.  (Tr. 208).  In the following visits, Plaintiff reported filing a lawsuit on behalf of her daughter and also complained of depression because she did not

have "causes" which ordinarily consumed her time, energy and attention.  (Tr. 480-482).  At the request of State Disability Determination Services ("DDS"), Plaintiff visited Wendy Schwartz, Ph.D., a consulting Psychiatrist, on April 1, 2002, to undergo a mental evaluation.  (Tr. 211-215). Plaintiff reported that she awoke every morning at 6:00 and cleaned around the house, talked on the telephone, researched on the computer and was often so busy that she had to order take-out for dinner.  (Tr. 213).  Plaintiff's scores were in normal limits on a mini-mental status examination.  (Tr. 214).  Dr. Schwartz diagnosed mood disorder secondary to a medical condition (chronic fatigue syndrome) versus adjustment disorder with depressed mood.  Id.  She opined that Plaintiff's limitations were primarily due to physical issues and that Plaintiff had no impairment in her ability to understand and follow directions.  Id.

Dr. Edward Hanna, a DDS Physician, reviewed the evidence on February 28, 2002 and completed a residual functional capacity ("RFC") assessment.  (Tr. 178-185).  He opined that Plaintiff could perform light work but could only occasionally climb, balance, stoop, kneel, crouch and crawl and needed to avoid concentrated exposure to cold, heat and wetness.  (Tr. 180).

Plaintiff began occupational therapy in March 2002 with goals of opening jars with minimal pain and performing activities of daily living with no pain.  (Tr. 350-351).  The initial evaluation showed that Plaintiff was able to perform multi-step instructions and had good short- and long-term memory.  (Tr. 350).  Plaintiff participated in therapy, and by April 8, 2002, she reported that she felt better and wanted to try to work as a massage therapist.  (Tr. 362).  On April 25, 2002, Plaintiff reported that she had attempted to complete a full body massage and had numbness in her hand after the session.  (Tr. 369).  The therapist reminded Plaintiff to use a splint and rest her hand.  Id.  The following week Plaintiff completed a thirty-minute massage.  (Tr. 370).  Plaintiff met her goals for

occupational therapy on May 29, 2002 and discharged herself reporting that she felt better with no increase of symptoms.  (Tr. 373-376).

Plaintiff presented to Dr. Giovetti on April 2, 2002, complaining of pain in her back, head, ear and throat.  (Tr. 246).  Dr. Giovetti diagnosed questionable chronic fatigue syndrome.  (Tr. 247). Plaintiff then visited Dr. Keith Rafal, a fibromyalgia specialist, who assessed multiple trigger points, normal upper body strength and negative straight leg raise.  (Tr. 334-336).  Dr. Rafal diagnosed fibromyalgia but noted that Plaintiff was dealing with stress in her life that exacerbated her symptoms.  (Tr. 336).  Plaintiff began relaxation therapy at the Providence Center (Tr. 523) and showed some improvement with treatment.  (Tr. 527-529).

Plaintiff complained of multiple joint pains at visits with Dr. Giovetti in July and August 2002.  (Tr. 256, 258).  Physical assessments were within normal limits.  (Tr. 256-258).  On May 16, 2002, Clifford Gordon, Ed.D., a DDS Psychologist, reviewed the evidence and opined that Plaintiff could understand, remember and complete basic routine, repetitive tasks with three to four consistent steps and that she would have no interpersonal impairments and would be able to adapt to ordinary changes occurring in the work environment.  (Tr. 216-222).

Dr. Susan Diaz Killenberg, a DDS Psychiatrist, evaluated the record on August 21, 2002, and completed a psychiatric review technique and functional assessment.  (Tr. 298, 306).  She opined that Plaintiff could perform activities of daily living and would be able to understand and recall simple and complex tasks and work procedure.  (Tr. 301).  Dr. Killenberg suggested that Plaintiff may miss one to three days of work per month due to poor sleep and fatigue but would be able to keep pace with tasks that were not highly time-pressured.  Id.  Dr. Killenberg also found that Plaintiff would be slow to respond to change but would be able to relate appropriately to others.  (Tr.

-14-

299-306).  Later that month, a DDS medical consultant completed a physical RFC assessment and opined that Plaintiff could perform light work with ten-minute rest periods every two to four hours and only occasional climbing, balancing, stooping, kneeling, crouching and crawling.  (Tr. 308-315, 330-333).

The remaining medical evidence in the record is all dated after September 30, 2002, which was Plaintiff's DLI.  (Tr. 92).  Plaintiff visited Dr. Michael Feldman, an Orthopedic Physician, on October 10, 2002, for an evaluation of right shoulder pain and was diagnosed with a partial thickness and possible full thickness tear.  (Tr. 337-338).  In November 2002, Plaintiff complained of pain to her nurse practitioner (Tr. 391-392, 394), but testing showed a normal right and left hip, normal right knee and hypertrophy at L5-S1 of the lumbosacral spine.  (Tr. 393).

Dr. Ken Lemmond, a Psychiatrist, evaluated Plaintiff on November 18, 2002, and opined that Plaintiff was depressed, but had above average intelligence, an appropriate affect, and was logical, coherent and goal-directed.  (Tr. 435-439).  Dr. Lemmond diagnosed major depressive disorder and assigned a GAF of fifty with a good prognosis.  (Tr. 439).  Plaintiff continued to visit her mental health therapist in 2003.  (Tr. 484-493).  In January 2003, she reported numerous somatic complaints.  (Tr. 494).  Her therapist opined that Plaintiff and her family were experiencing severe chronic psychosocial stressors and had resulting somatic complaints.  (Tr. 497).  The next month, Plaintiff reported that her house repairs were nearing completion, and her load was getting lighter. (Tr. 498).  In April 2003, Plaintiff appeared more relaxed with decreased anxiety.  (Tr. 501).  The therapist noted that Plaintiff placed her house remodeling and the needs of family members above her own self-care.  (Tr. 503).

In early 2003, Dr. Alla Korennaya, a Neurologist, tested Plaintiff and found that she had mild right-sided carpal tunnel syndrome and mild chronic right sided L-5 radiculopathy. (Tr. 343, 378-380). Plaintiff visited the Northwest Health Center complaining of an increased cough due to dust from remodeling her house and also reported pain in her shoulder and back. (Tr. 399). Plaintiff returned to the orthopedic group in February 2003 due to complaints of shoulder pain. Id. She was advised to have surgery to repair her shoulder, and she received a steroid injection. (Tr. 339). The next month, Plaintiff returned and reported that she had short-term relief from the injection and also complained of pain in her neck. (Tr. 340). An MRI showed only mild degenerative disease of her lumbar spine with a herniation in her cervical spine. Id. Plaintiff wanted to have her knee evaluated prior to any treatment for her cervical spine or shoulder. Id. An MRI of the knee was essentially normal, and she was diagnosed with possible early degenerative changes or meniscus pain. (Tr. 341). Plaintiff received an injection to her knee. (Tr. 342).

In May and June 2003, Plaintiff visited Dr. Korennaya, with complaints of pain. (Tr. 344-345). Dr. Korennaya noted that Plaintiff was attending physical therapy to address her back pain, an MRI of the brain was normal, and bone scans of both hands and thigh bones were normal. Id. On June 12, 2003, Dr. Korennaya completed a physical capacity evaluation and opined that Plaintiff could only sit for one hour and stand for one hour in an eight-hour workday. (Tr. 346). She further assessed that Plaintiff could lift and carry only up to five pounds and could perform no repetitive action of the upper or lower extremities. Id. She further noted that Plaintiff could bend, squat, kneel and crawl only occasionally. Id.

Around this time, Plaintiff complained of pain, fatigue, anxiety and depression at visits with her primary care providers. (Tr. 416-418). On September 15, 2003, Dr. Giovetti completed a

medical questionnaire and opined, among other things, that Plaintiff had a substantial loss of her ability to understand, remember and carry out simple instructions and a substantial loss of her ability to respond to others and deal with changes. (Tr. 348-349). Dr. Giovetti opined that these limitations had lasted or could be expected to last for at least twelve months. Id.

Plaintiff presented for follow up with Dr. Rafal on September 15, 2003. (Tr. 516). Dr. Rafal observed that Plaintiff moved around the room at a slow pace but was able to heel toe walk and had negative straight leg raises. (Tr. 517). Dr. Rafal assessed positive trigger points and noted that Plaintiff appeared to meet the fibromyalgia diagnosis at the time. (Tr. 518). Dr. Rafal encouraged Plaintiff to follow the treatment plan. Id.

Later that fall, Plaintiff visited a Dr. Kazi Salahuddin, a Psychiatrist, who diagnosed her with major depressive disorder and generalized anxiety. (Tr. 510). On December 12, 2003, Dr. Salahuddin assessed Plaintiff and completed an RFC questionnaire in which she opined that Plaintiff had moderately severe restrictions on her ability to perform daily activities, respond to customary work pressures and perform complex tasks. (Tr. 441-442).

Dr. Giovetti completed a physical capacity evaluation on November 23, 2003, and opined that Plaintiff could sit for two hours and stand and walk for only one hour each in an eight-hour workday. (Tr. 443). Dr. Giovetti opined that Plaintiff could lift only up to five pounds on an occasional basis. Id. She further opined that Plaintiff could not reach or pull with her hands and could only occasionally bend, squat and kneel. Id. Just a few weeks later, Dr. Giovetti completed another physical capacity evaluation and opined that Plaintiff could lift up to ten pounds less than occasionally and five pounds occasionally. (Tr. 444). Dr. Giovetti opined that Plaintiff had severe symptoms since April 2001 and could not sustain full-time employment. (Tr. 445-446).

-17-

On January 7, 2004, Dr. Korennaya completed a medical questionnaire in which she opined that Plaintiff had moderate to severe symptoms, and could not sustain full-time employment. (Tr. 513). She further opined in a pain questionnaire that Plaintiff had moderate to severe pain that could preclude sustained concentration and productivity. (Tr. 514). According to Dr. Korennaya, Plaintiff could sit and stand up to one hour each, and could less than occasionally lift up to five pounds with no repetitive use of the arms or legs. (Tr. 515).

Plaintiff was in a car accident in January 2004, and complained of numbness and tingling in her right and left arm. (Tr. 539). She was advised to receive massage therapy and follow-up with orthopedic physicians regarding the disc disease of her spine. (Tr. 544). In September 2004, Plaintiff received physical therapy for neck and back pain. (Tr. 562). After evaluating Plaintiff on October 21, 2004, Dr. Norman Gordon, a Neurologist, opined that Plaintiff had fibromyalgia, and he suggested using prednisone. (Tr. 580-583). Plaintiff complained of leg pain in November 2004, but her providers noted that her chronic pain was stable on medication. (Tr. 566-567). On April 21, 2005, Dr. Gordon opined that Plaintiff experienced what is characterized as fibromyalgia with mild cervical radiculopathy. (Tr. 580). He further opined that she would be disabled due to muscle pain and fatigue and would have difficulty carrying, lifting, pulling and pushing due to radiculopathy. Id.

On April 15, 2005, Dr. Giovetti completed a physical capacity evaluation and opined that Plaintiff could sit for two hours, stand and walk for one hour each, and could only occasionally lift up to five pounds. (Tr. 590). Dr. Giovetti further opined that Plaintiff could not reach, push, pull or perform fine manipulation. Id.

Plaintiff appeared and testified at the first hearing on January 9, 2004.  (Tr 642-672). Plaintiff testified that she could not work because she was in pain and she felt confused and dizzy due to her medication.  (Tr. 648-649).  She stated that she could perform housework with some assistance, (Tr. 650-651), but had trouble lifting eight pounds and was only able to stand for an hour or two at the most.  (Tr. 651).  Plaintiff stated that she was able to perform activities for an hour and then needed to rest.  (Tr. 656).  She testified that she had a torn rotator cuff for which surgery was recommended, however, she had not scheduled it yet.  (Tr. 658).  She also noted that she cared for her daughter and husband who both had health issues.  (Tr. 660).

The second hearing was held on May 5, 2005.  (Tr. 609-641).  Plaintiff testified that she lived with her husband and daughter and last worked full-time in July 2001, but worked part-time through January 2002.  (Tr. 614- 615).  Plaintiff stated that her most severe pain was in her spinal column. (Tr. 619).  Plaintiff testified that she could stand about twenty minutes (Tr. 620) and sit for about forty-five minutes.  (Tr. 621).  She stated that prior to September 2002, she was able to alternate between sitting and standing for a few hours before she needed to lie down.  Id.  She also used pain medication and physical therapy to decrease her pain during that time.  (Tr. 622).  Plaintiff testified that her medications caused her confusion, and she had difficulty making it through the day due to fatigue.  (Tr. 623).  Plaintiff stated that she had a low mood, difficulty concentrating (Tr. 624-625) and cried easily.  (Tr. 627).  Plaintiff testified that she had tried hypnosis, ice, heat and magnetic products to help relieve the pain.  Id.  Plaintiff stated that after therapy her pain level would decrease from eight or nine to six or seven.  (Tr. 628).  She stated that prior to 2002, she could lift only up to eight pounds (Tr. 630) and family and friends helped her with housework.  Id.

Plaintiff's husband also testified at the second hearing.  (Tr. 635-639).  He testified that in 2001 and 2002 his wife complained of pain and soreness all over her body and was always lying down.  (Tr. 636).  He testified that Plaintiff had difficulty lifting and doing housework.  (Tr. 637).  He further stated that Plaintiff had trouble with short-term memory and was easily stressed out.  (Tr. 639).

The VE testified at the first hearing.  (Tr. 664).  The ALJ asked the VE to consider a hypothetical individual with the same age, education and work experience as Plaintiff who would be able to perform light work but could only use the right upper extremity to sedentary levels of force for varied but not continuous repetitive activities.  Id.  Additionally, the individual would have moderate reduction of memory to carry out complex or detailed job instructions and would be limited to only occasional complex tasks and otherwise simple work tasks.  (Tr. 664-665).  The VE testified that with those limitations the individual could work as a receptionist, bookkeeper, accounting clerk and unskilled cashier.  (Tr. 666).  At the second hearing, the ALJ asked the VE how many absences would be tolerated for someone working as a cashier.  (Tr. 640).  The VE testified that any more than one day (presumably per month) would be a problem.  Id.

### A.    The ALJ's RFC Assessment is Supported by Substantial Evidence

The ALJ decided this case adverse to Plaintiff at Step 5.  The ALJ found that the medical evidence established that Plaintiff has chronic fatigue syndrome ("CFS"), fibromyalgia, stenosis, right shoulder arthritis/tear, depression and anxiety disorder.  (Tr. 28).  The ALJ found that these impairments were "severe" within the meaning of 20 C.F.R. § 404.1521 but not of "Listing-level" severity.  (Tr. 20, 28).

After considering the medical evidence and evaluating Plaintiff's credibility, the ALJ concluded that Plaintiff retained the RFC to perform a limited range of light work with several exertional and nonexertional limitations including moderate limitations in the ability to understand, remember and carry out complex instructions and in the ability to maintain concentration. (Tr. 28). Based on this RFC, the VE testified that a person with such RFC could perform a significant number of jobs including unskilled cashier positions at both the light and sedentary level. (Tr. 29, 666).

Plaintiff primarily challenges the ALJ's evaluation of the medical evidence as it relates to her CFS and fibromyalgia and contends that the ALJ gave insufficient weight to treating source opinions. Plaintiff also contends that the ALJ failed to properly evaluate her subjective complaints. Put another way, Plaintiff claims the ALJ erred by finding that she exaggerated her pain and symptoms and was "not credible." (Tr. 25).

Plaintiff attempts a compartmentalized attack on the ALJ's decision rather than looking at the totality of the ALJ's evaluation of all the evidence (medical and otherwise). However, a review of the record in its entirety reveals that the ALJ's RFC assessment is supported by substantial evidence and thus is entitled to deference.

Plaintiff contends that the ALJ erred by relying, in part, on the lack of objective evidence to quantify her pain and fatigue. Plaintiff cites to the case of Rose v. Shalala, 34 F.3d 13 (1st Cir. 1994), for the proposition that once there is a finding of CFS, the ALJ must conclude that Plaintiff suffers from the associated symptoms. She faults the ALJ, in the case at hand, for relying on objective evidence and discrediting her and the opinions of her treating physicians. In Rose, the ALJ found that the claimant's alleged fatigue did not significantly impact his functional capacity, however, the only evidence supporting this finding were the assessments of nonexamining

physicians. Rose, 34 F.3d at 19. Here, the ALJ accounted for Plaintiff's fatigue in his functional capacity finding, but found that she was not as limited as she alleged based on inconsistencies in the record. (Tr. 21-27). He considered the medical evidence, including objective evidence, and also considered the extent of Plaintiff's daily activities. Id. Thus, unlike the situation in Rose, the ALJ in this case relied on more than just the reports of non-examining physicians in his decision.

In establishing Plaintiff's RFC, the ALJ reasonably reviewed the opinions of Plaintiff's treating and examining medical sources and declined to afford them significant weight. The ALJ reasonably discredited Dr. Giovetti's opinion because it was inconsistent with her treatment notes and other evidence of record, and dated well over one year after Plaintiff's DLI. (Tr. 23-24). As the ALJ accurately points out, Dr. Giovetti's opinion changed within a very short period of time (from December 16 to December 23, 2006). (Tr. 443, 444). While it is true that the only change was a decrease in the amount Plaintiff could lift, Dr. Giovetti failed to provide an explanation for the change. In fact, Dr. Giovetti failed to provide any written explanation from her treatment notes to support her opinions. See 20 C.F.R. § 404.1527(d)(3) ("[t]he better an explanation a source provides for an opinion, the more weight we will give to that opinion").

Additionally, as the ALJ accurately noted, Dr. Giovetti's opinions were given after Plaintiff's DLI. Plaintiff contends that Dr. Giovetti's opinion relates to the relevant time period because her treatment notes show that Plaintiff complained of the same pain before and after her DLI. However, other than a circled number noting Plaintiff's subjective account of pain, the treatment notes lack specific details of Plaintiff's complaints and fail to indicate that Plaintiff had significant limitations during that time. (Tr. 232-237, 240-242, 246-259). Dr. Giovetti's opinion that Plaintiff was totally disabled is also inconsistent with evidence of Plaintiff's activities such as preparing meals, visiting

with friends, performing research and working as a massage therapist on a part-time basis. (Tr. 137-139, 614-615).

Plaintiff asserts that the ALJ should have obtained clarification from Dr. Giovetti concerning the onset date of disability.  However, an ALJ must only do so when a report from that source contains a conflict or ambiguity that must be resolved, does not contain necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. See 20 C.F.R. § 404.1512(e)(l).  Here, the ALJ simply considered that Dr. Giovetti had never opined that Plaintiff was disabled during the relevant time period, even though she treated Plaintiff during that time.  Even if Dr. Giovetti were to give an after-the-fact opinion, that does not change the fact that she never opined that Plaintiff was disabled during her treatment of Plaintiff in the relevant time period.  Thus, the ALJ reasonably considered this along with other factors in his determination of the weight to assign to Dr. Giovetti's opinions.

Plaintiff further argues that the ALJ ignored Dr. Giovetti's opinions concerning Plaintiff's mental health. Contrary to Plaintiff's contentions, the ALJ specifically considered this opinion when he noted that Dr. Giovetti opined that she had "substantial loss of concentration and social functioning."  (Tr. 22).  The ALJ did not need to attribute significant weight to this opinion, however, because Dr. Giovetti is not a specialist in mental health.  See 20 C.F.R. § 404.1527(d)(5) (more weight is generally given to the opinion of a specialist about medical issues related to his or her area of specialty compared to a source who is not a specialist). Furthermore, Dr. Giovetti' s treatment notes from the relevant time period fail to show that she contemporaneously assessed any significant mental limitations. (Tr. 232-241, 246-259).

The ALJ also reasonably discredited Dr. Salahuddin's opinion (Tr. 441-442) that Plaintiff would have moderately-severe impairments in her ability to respond to customary work pressures. (Tr. 23). As the ALJ discussed, Plaintiff had limited treatment with psychologists, (Tr. 23), and it appears that Dr. Salahuddin did not even evaluate Plaintiff until over a year after her DLI, at which time he only met with Plaintiff on a couple of occasions.  (Tr. 440-442, 510-511).  Such limited treatment would not provide the "detailed longitudinal picture" of Plaintiff's impairments contemplated by 20 C.F.R. § 404.1527(d)(2) so as to justify the assignment of significantly more weight to Dr. Salahuddin's opinions over those of other medical sources. Moreover, Dr. Salahuddin's treatment notes indicated that Plaintiff had been stable but just on "the depressed side." (Tr. 440).

Plaintiff argues that Dr. Salahuddin's opinions are consistent with those of Dr. Giovetti. However, as noted above, Dr. Giovetti is not a mental health specialist, and her treatment notes fail to show documentation of significant mental limitations during the relevant time period. Indeed, the ALJ considered Plaintiff's GAF score and records that showed that stress exacerbated her symptoms. (Tr. 22). The ALJ reasonably determined, however, that this evidence did not support a finding of moderately severe mental impairments particularly in light of the evidence of record including the findings of Dr. Schwartz, a consulting Psychiatrist who met with and evaluated Plaintiff during the relevant time period, and found only mild mental limitations. (Tr. 211-215).  It is within the ALJ's province to evaluate and weigh conflicting medical evidence and, if appropriate, to place greater weight on the report of a medical expert.  Coggon v. Barnhart, 354 F. Supp. 2d 40, 54 (D. Mass. 2005) (citing Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275, n.1 (1st Cir. 1988)).

The ALJ also reasonably dismissed the opinion of Dr. Korennaya because it was inconsistent with her treatments notes and set forth after Plaintiff's DLI. (Tr. 23). Dr. Korennaya opined that Plaintiff could not use her legs or arms for any manipulative action and could only lift up to five pounds with either arm. (Tr. 346). However, as the ALJ discussed, Dr. Korennaya's records did not support this finding, as they showed that Plaintiff had only mild carpal tunnel syndrome and mild radiculopathy. (Tr. 343). Also, while Dr. Korennaya assessed significant limitations in both the right and left arm, her notes fail to document that Plaintiff had any complaints or problems with the left arm. Moreover, Plaintiff's assertion that Dr. Korennaya limited Plaintiff's use of her arm due to her knowledge of Plaintiff's overall treatment records, does not explain the inconsistency with Dr. Korennaya's own records which show only mild problems with the right arm. It has been described as "perfectly reasonable" for an ALJ to emphasize clinical findings over a treating physician's responses in conclusory medical questionnaires. Lacroix v. Barnhart, 352 F. Supp. 2d 100, 112 (D. Mass. 2005). Plaintiff fails to point to any evidence supporting such significant limitations of the left arm. Moreover, Dr. Korennaya did not even examine Plaintiff until several months after Plaintiff's DLI and failed to support her opinions with specific findings.

The ALJ also reasonably declined to accept the opinion of Dr. Norman Gordon, a Neurologist. (Tr. 23). Dr. Gordon opined that Plaintiff could not work as a result of difficulty carrying, lifting, pulling and pushing with her right upper extremity, and pain and fatigue from fibromyalgia. (Tr. 580). It appears that Dr. Gordon evaluated Plaintiff on only four occasions between October 2004 and March 2005, which is two years after her DLI. (Tr. 580-589). The ALJ did not, as Plaintiff suggests, fail to explain why he rejected the opinion. In fact, he noted that Dr. Gordon, along with other treating and examining sources, found Plaintiff disabled well after her DLI

and failed to provide evidence to support a finding that the opinion related back to the relevant time period. (Tr. 24). Additionally, Dr. Gordon's opinion, along with the opinions of the other treating sources, is inconsistent with Plaintiff's daily activities during the relevant time period. Id. Plaintiff was working part-time as a massage therapist into 2002 (Tr. 350, 369, 370, 615-618) and this requires the performance of activities such as reaching and standing, all of which the treating sources found Plaintiff could not perform.

A review of the record reveals that the ALJ thoroughly considered the opinions of Plaintiff's treating sources and provided sufficient reasons for failing to afford them significant weight. The ALJ noted each physician's specialty and the treatment history of Plaintiff and properly considered that most of the physicians had not even treated Plaintiff until after her DLI. (Tr. 23-24). As discussed above, the ALJ noted the lack of supporting evidence and inconsistencies with the record as a whole. Plaintiff argues that the ALJ improperly relied on objective findings in his decision. However, Plaintiff alleged disability for a number of reasons along with CFS and fibromyalgia including spinal problems and shoulder problems, and therefore, the ALJ can reasonably discount opinions based on subjective symptoms as opposed to medically acceptable findings. See Vincent v. Astrue, No. 1:07-C V-28, 2008 WU 596040 *9-10 (N.D. Ind. March 3, 2008) (finding that ALJ properly discredited treating physician's opinion based on claimant's subjective complaints when claimant had alleged disability due to fibromyalgia among other impairments and, as in this case, the ALJ had reason to doubt the claimant's credibility). Thus, the ALJ considered the relevant factors set forth in the regulations, and Plaintiff has shown no error. 20 C.F.R. § 404.1527(d)(2).

An ALJ who does not find credible a claimant's testimony concerning the severity of her symptoms "must make specific findings as to the relevant evidence he considered in determining

to disbelieve the [claimant]." <u>Da Rosa v. Sec'y of Health and Human Servs.</u>, 803 F.2d 24, 26 (1st Cir.

1986). In addition to objective medical evidence, the ALJ must also consider factors including

Plaintiff's daily activities, a description of her symptoms, precipitating and aggravating factors, the

type, dosage, effectiveness and side effects of medication, any non-medical treatment; and any other

factors concerning Plaintiff's limitations.  <u>See</u> 20 C.F.R. § 404.1529(c)(3); <u>Avery v. Sec'y of Health

and Human Servs.</u>, 797 F.2d 19, 29 (1st Cir. 1986).  "The credibility determination by the ALJ, who

observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the

rest of the evidence, is entitled to deference, especially when supported by specific findings."

<u>Frustaglia v. Sec'y of Health and Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987).  Plaintiff argues

that the ALJ improperly dismissed her subjective complaints. While Plaintiff has presented medical

evidence that she had impairments which produced some degree of limitation, the ALJ reasonably

determined that the record as a whole did not support her contention that her conditions were so

severe as to render her disabled. The ALJ still considered her limitations, however, as he found that

she could only perform a limited range of light work.  (Tr. 25-26).  "It is the responsibility of the

[Commissioner] to determine issues of credibility and to draw inferences from the record evidence."

<u>Ortiz v. Sec'y of Health and Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991). As discussed below,

substantial evidence supports the ALJ's credibility determination.

In finding Plaintiff "not credible," the ALJ reasonably considered inconsistencies in her

statements.  The ALJ considered that while Plaintiff testified that she was severely limited during

the relevant time period, the activity forms she had completed in 2002, prior to her DLI, indicated

that she was not as limited as she testified.  At the hearing, the ALJ questioned Plaintiff about the

discrepancies, and she admitted that her memory of that time period was not good and that the 2002

report was more accurate. (Tr. 634-635).  While the forms shows that Plaintiff received some help with activities, they also show that Plaintiff was not taking any medication and was able to prepare up to three meals a day, talk and visit with friends, attend campfires and perform research.  (Tr. 137-139). These activities are inconsistent with her allegations of total disability.  See Wells v. Barnhart, 267 F. Supp. 2d 138, 146 (D. Mass. 2003) (claimant's activities, including child care and light housework, were inconsistent with her complaints of disabling pain).  Indeed, medical records from that time period support Plaintiff's notations on the forms as they show that Plaintiff was busy with many consuming activities (Tr. 192) and she even admitted that she was often so busy that she had to order take out for dinner.  (Tr. 213).

The ALJ also considered Plaintiff's efforts to work as part of his credibility determination. While Plaintiff alleged disability beginning in July 2001, she continued to work part-time into 2002 as a massage therapist. Plaintiff testified that she stopped working part-time by December 2001, but the record shows that she was still performing massages in 2002. (Tr. 369-370). Additionally, the ALJ reasonably considered that Plaintiff had not reported her earnings or paid taxes on her income. (Tr. 24, 616). See Berger v. Apfel, 516 F.3d 539, 546 (7th Cir. 2008) (finding that failing to report income on income taxes could "justify a more skeptical view of [claimant's] testimony.").  While it is true that a claimant need not prove that she was bedridden to be found disabled, Plaintiff's attempts to work as a massage therapist (a medium-duty job (Tr. 664)) weigh against her allegations of complete disability during the relevant time.  See Berger, supra (finding the fact that the claimant could perform some work cut against his claim that he was totally disabled).

The ALJ properly evaluated all of the medical evidence and the credibility of Plaintiff's reports as to pain and function.  Because his conclusions are supported by the record, they are

entitled to deference.  Although Plaintiff disagrees with the ALJ's ultimate conclusions, she has not shown any error in the ALJ's evaluation of medical evidence.  See Rivera-Torres v. Sec'y of Health and Human Servs., 837 F.2d 4, 5 (1st Cir. 1988) (the resolution of evidentiary conflicts is within the province of the ALJ); see also Castro v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002) ("[An ALJ] may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors.").  Furthermore, treating source opinions based primarily on subjective pain complaints may be discounted by an ALJ under these circumstances.  See Reeves v. Barnhart, 263 F. Supp. 2d 154, 161 (D. Mass. 2003).  Plaintiff has shown no error by the ALJ in evaluating the evidence and assessing an RFC.

**B.  The ALJ's Failure to Inquire Under SSR 00-4p Does Not Require Remand in this Case.**

Plaintiff also argues that remand is required because the ALJ violated his administrative responsibility to ask the VE if his testimony is consistent with the Dictionary of Occupational Titles ("DOT").  SSR 00-4p requires that an ALJ affirmatively ask a VE if his or her testimony is consistent with the occupational information contained in the DOT.  It is undisputed that the ALJ did not directly make this inquiry.  The ALJ did, however, reference the DOT for support during a portion of his testimony.  (See Tr. 664).  Plaintiff offers no evidence or argument that the VE's testimony in fact contradicted the DOT.  Rather, Plaintiff essentially seeks remand based solely on the technicality of failing to ask the question.

Although the First Circuit has not addressed this particular issue, other courts in this Circuit have held that "the mere failure to ask such a question cannot by itself require remand; such an exercise would be an empty one if the [VE's] testimony were in fact consistent with the DOT."

Hodgson v. Barnhart, No. 03-185-B-W, 2004 WL 1529264 (D. Me. June 24, 2004).  See also

Wilcox v. Barnhart, No. Civ. 03-408-PB, 2004 WL 1733447 (D.N.H. July 28, 2004).  In this case,

the VE's testimony before the ALJ was relatively straightforward.  (Tr. 664-671).  Plaintiff's counsel

cross-examined the VE and has not presented any evidence of a conflict or other prejudicial error.

Since Plaintiff has not argued or identified any such inconsistency, her argument is purely technical

and constitutes, at worst, harmless error.  Giles v. Barnhart, No. 06-28-B-W, 2006 WL 2827654 at

*3 (D. Me. Sept. 29, 2006) (ALJ's failure to ask the SSR 00-4p question to the VE is harmless where

claimant could return to past relevant work "as she performed it.").

Plaintiff further asserts that there is an "apparent conflict with the DOT" because the ALJ's

hypothetical called for a combination light/sedentary job not covered by the DOT.  (See Document

No. 6 at p. 27).  Plaintiff's argument is not supported by the record.  The ALJ found Plaintiff capable

of performing a limited range of light work.  Based on that RFC, the ALJ determined that Plaintiff

could perform unskilled cashiering at either the light or sedentary level.  (Tr. 666).  The VE testified

that 3,297 cashier positions at the light, unskilled level existed in Rhode Island and 549 at the

sedentary, unskilled level.  Id.  The VE also testified that those numbers would increase if he looked

beyond Rhode Island to Massachusetts.  (Tr. 667).  In his decision, the ALJ accurately stated that

the VE "testified that there are approximately, in the aggregate, 3,846 [3,297 + 549 = 3,846]

otherwise sedentary and light jobs in the Rhode Island economy which [Plaintiff] could perform."

(Tr. 27).  (emphasis added).  Plaintiff has shown no conflict, apparent or otherwise, between the

DOT and the VE's testimony.  The ALJ correctly interpreted the VE's testimony, and Plaintiff has

shown no error in the ALJ's utilization of the VE's testimony in determining disability status.

### C.     Plaintiff Has Not Presented a Reviewable Appeals Council Decision

Plaintiff contends that the Appeals Council erred in refusing to remand based upon additional evidence submitted after the ALJ's decision. (Tr. 9, 604-608). In particular, Plaintiff points to a two-question questionnaire completed by a treating physician, Dr. Giovetti, on September 16, 2005. (Tr. 608). Dr. Giovetti opined that Plaintiff was likely to miss more than one day of work each month due to her impairments and such was true more than three years earlier "before September of 2002."[1] Id. Dr. Giovetti does not identify any support for her opinion and it is plainly a post-hearing attempt to conform the medical opinion evidence to the VE's testimony. Plaintiff asserts that the Appeals Council erred by not remanding this case to the ALJ to consider this additional evidence or "at the very least [it] should have explained its reasoning in rejecting it."[2] (Document No. 6 at 28).

Generally, the discretionary decision of the Appeals Council to deny a request for review of an ALJ's decision is not reviewable. A judicial review under 42 U.S.C. § 405(g) is typically focused on the findings and reasoning of the ALJ, i.e., whether the ALJ's findings are supported by substantial evidence and whether the ALJ has properly applied the law. Of course, it makes no sense from an efficiency standpoint for a reviewing court to spend time and resources critiquing the work of the Appeals Council when it has jurisdiction to review the underlying and operative ALJ decision. In other words, reversible error by an ALJ can be remedied by the Court regardless of what the Appeals Council did or did not do.

---

[1] Plaintiff's DLI is September 30, 2002, and thus the issue before the ALJ is Plaintiff's disability on or prior to that date.

[2] Plaintiff has provided no persuasive authority for his argument that remand to the Appeals Council is required because of a failure to adequately explain its reasoning. Such a rule would result in automatic remands in most cases since the Appeals Council often does not, and is not required to, provide a detailed explanation of its decisions. See Waters v. Astrue, 495 F. Supp. 2d 512, 514-515 (D. Md. 2007) (failure of Appeals Council to explain how it evaluated new evidence presented to it does not require remand).

The First Circuit has, however, held that review of Appeals Council action may be appropriate in those cases "where new evidence is tendered after the ALJ decision." Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001). In such cases, "an Appeals Council refusal to review the ALJ may be reviewable where it gives an egregiously mistaken ground for this action." Id. This avenue of review has been described as "exceedingly narrow." Harrison v. Barnhart, C.A. No. 06-30005-KPN, 2006 WL 3898287 (D. Mass. Dec. 22, 2006). Further, the term "egregious" has been interpreted to mean "[e]xtremely or remarkably bad; flagrant," Ortiz Rosado v. Barnhart, 340 F. Supp. 2d 63, 67 (D. Mass. 2004) (quoting Black's Law Dictionary (7th ed. 1999)).

Here, the Appeals Council issued a "boiler plate" denial of Plaintiff's Request for Review. (Tr. 10-12). It noted that the "additional evidence" submitted by Plaintiff was considered, and it concluded that such evidence did "not provide a basis for changing the [ALJ's] decision." (Tr. 11). The additional evidence is briefly discussed by the Appeals Council. Id. Plaintiff contends that the Appeals Council should have "explained its reasoning" further. (Document No. 6 at p. 28).

While Plaintiff's point has some appeal at first blush, it is exposed as flawed when you look closely at the First Circuit's reasoning in Mills. In Mills, the First Circuit recognized that an Appeals Council denial of a request for review has all the "hallmarks" of an unreviewable, discretionary decision. Mills, 244 F.3d at 5. The Appeals Council is given a great deal of latitude under the regulations and "need not and often does not give reasons" for its decisions. Id. Thus, the First Circuit "assume[d] that the Appeals Council's refusal to review would be effectively unreviewable if no reason were given for the refusal." Id. at p. 6. It did, however, create a narrow exception for review when the Appeals Council "gives an egregiously mistaken ground for [its] action." Id. at p. 5. The First Circuit did not find this result to be a "serious anomaly" because

"there is reason enough to correct an articulated mistake even though one cannot plumb the thousands of simple 'review denied' decisions that the Appeals Council must issue every year." Id. at p. 6.  Plaintiff's argument is basically an attempt to turn the narrow Mills rule inside/out.

Even if this Court concluded that Plaintiff has presented a decision reviewable under Mills, Plaintiff has shown no error.  Since Plaintiff's DLI is September 30, 2002, the issue is whether Plaintiff has established disability on or prior to that date.  The "new" evidence proffered by Plaintiff to the Appeals Council on October 4, 2005 opines on Plaintiff's condition three years earlier.  Finally, the "new" evidence is arguably cumulative as the record before the ALJ included substantial treatment records from Dr. Giovetti.  (See, e.g., Exs. 6F and 28F).

Since Plaintiff proffered the "new" evidence to the Appeals Council, it is undisputed that the Mills test, and not the more forgiving Evangelista test, applies.  See Ortiz Rosado, 304 F. Supp. 2d at 67 n.1.  Plaintiff has not established that the Appeals Council was "egregiously mistaken" in its decision to deny Plaintiff's request for review.  Plaintiff's attorney could have sought an opinion from Dr. Giovetti and submitted it to the ALJ before he issued his decision.  He did not do so, and the Court must review the ALJ's decision based on the record before him at the time.  Further, although the ALJ did not have the opportunity to consider such opinion, he did have all or most of the underlying records when he rendered his decision.  Plaintiff has shown no error.

## VI.    CONCLUSION

For the reasons stated above, I order that the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Document No. 8) be GRANTED and that Plaintiff's Motion to Reverse the Decision of the Commissioner (Document No. 6) be DENIED.  Final judgment shall enter in favor of the Commissioner.

   /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
October 14, 2008